IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ERMA CHRISTENSEN, Administrator of the Estate of Norman J. Preston;<br><br>Plaintiff,<br><br>vs.<br><br>CHAPPELL FEEDLOT, LLC,<br><br>Defendant. | 4:21-CV-3065<br><br>MEMORANDUM AND ORDER |

The plaintiff, Erma Christensen, has brought a negligence claim on behalf of the Estate of Norman Preston, who sustained fatal injuries when his vehicle struck a heifer owned by the defendant, Chappell Feedlot, LLC. Filing 1 at 1-2. Ms. Christensen now moves this Court for an order in limine excluding the testimony of the defendant's expert, Lynn Walworth. Filing 32. For the reasons outlined below, the Court will grant this motion.

I. BACKGROUND

On January 17, 2020, Mr. Preston was travelling westbound in Deuel County, Nebraska on U.S. Highway 30. Filing 1 at 2. This route placed Mr. Preston near the defendant's feedlot. Filing 1 at 2. The plaintiff alleges that, while on this route, a heifer owned by the defendant "entered the roadway in a manner that did not allow [Mr. Preston] to stop to avoid collision." Filing 1 at 2. Mr. Preston died from the injuries he sustained in this accident. Filing 1 at 2, 4.

According to the plaintiff, the defendant's negligent confinement and monitoring of its cattle caused the accident. Filing 1 at 2-4. Alternatively, the plaintiff argues the defendant's negligence can be inferred under the doctrine

of *res ipsa loquitor*, as the most probable explanation for the heifer's escape is the defendant's negligence given that the defendant had exclusive control over the instrumentalities used to confine it. Filing 1 at 3-4. But the defendant argues that the heifer's escape occurred without its negligence and was caused by a chain of events outside of its control. *See* filing 37 at 10. Accordingly, the defendant retained Lynn Walworth to provide expert testimony that (1) it exercised reasonable care in confining its cattle, and (2) the heifer's escape was likely caused by a raccoon fight outside of the defendant's control. *See* filing 26-2; filing 37 at 10-11.

  Mr. Walworth has over 60 years of experience working in the livestock industry. Filing 37 at 1-3; *see* filing 35-1 at 2. During this time, Mr. Walworth has owned and operated a livestock feedlot, built and maintained livestock enclosures, worked on ranches, and operated a livestock sales business where he purchased and delivered large quantities of livestock for feedlot owners. Filing 26-1; *see* filing 35-1 at 2-4. Mr. Walworth also spent 30 years working with livestock as a professional rodeo cowboy. Filing 26-1. And with this experience, he has served as a professional livestock expert for the last thirty years, opining on the reasonableness of confinement and monitoring methods used by livestock and ranching operations. Filing 26-1; *see* filing 35-1 at 5-15.

  The plaintiff argues that Mr. Walworth lacks sufficient qualifications to render such opinions, and that his opinions in this case lack intellectual rigor, as they are based on speculation and unsubstantiated assertions. Filing 33 at 1-2. Specifically, the plaintiff asserts that (1) Mr. Walworth did not use any reliable methodology or specialized knowledge to reach the conclusion that the defendant's fencing and operations "were reasonable and more than satisfy what would be considered acceptable practice and standards for similar facilities in western Nebraska," *see* filing 33 at 1-2, 6, and (2) Mr. Walworth's

"wildlife fight" theory "has no basis in fact, nor could it be discerned through any methodology." Filing 33 at 5. The Court will address these arguments in turn.

## II. DISCUSSION

While the Court believes Mr. Walworth is qualified to testify on the issues at hand in this case, the particular opinions he intends to offer were not reached using reliable methods and are connected to existing facts only by his *ipse dixit*. For these reasons, his testimony will be excluded.

The admissibility of expert testimony is governed by Fed. R. Evid. 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

A trial court is charged with a gatekeeping responsibility to ensure that all Rule 702 expert testimony and evidence to be admitted is both relevant and reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *United States v. Merrell,* 842 F.3d 577, 582 (8th Cir. 2016). In screening expert testimony, the trial court must assess whether evidence based on scientific, technical, or other specialized knowledge is useful for the jury, whether the witness is

3

qualified, and whether the evidence is trustworthy or reliable in an evidentiary sense. *Lauzon v. Senco Prod., Inc.,* 270 F.3d 681, 686 (8th Cir. 2001).

When determining whether a witness has sufficient knowledge to qualify as an expert, the Court must not "rank academic training over demonstrated practical experience." *Fox v. Dannenberg*, 906 F.2d 1253, 1256 (8th Cir. 1990). In this way, "an individual can qualify as an expert where he possesses sufficient knowledge gained from practical experience, even though he may lack academic qualifications in the particular field of expertise." *Id*. And relevance of an expert's opinion depends on whether his reasoning or methodology is applied properly to the facts at issue. *Marmo v. Tyson Fresh Meats, Inc.,* 457 F.3d 748, 757 (8th Cir. 2006). Testimony is relevant if it is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert,* 509 U.S. at 591.

The trustworthiness or reliability of an expert's testimony is measured by evaluating whether the methodology underlying the expert's conclusions is scientifically valid. *Id*. at 589-90; *Barret v. Rhodia, Inc.,* 606 F.3d 975, 980 (8th Cir. 2010). Factors to consider when assessing reliability include; (1) whether the expert's theories have been tested, (2) whether the expert's theories have been subject to peer review or publication, (3) whether there is a known or potential error rate, (4) whether there are controlling standards, (5) whether the theory or technique is generally accepted in the relevant scientific community, (6) whether the expertise was developed for litigation or naturally flowed from research, and (7) whether the expert ruled out other alternative explanations. *Russell v. Whirlpool Corp., 702 F.3d 450, 456 (8th Cir. 2012); Polski v. Quigley Corp., 538 F.3d 836, 839 (8th Cir. 2008).* The reliability inquiry is intended to be fact specific and flexible, with the trial court using,

adapting, or rejecting factors as the particular case demands. *Russell*, 702 F.3d at 450.

The trial court should focus its reliability inquiry on principles and methodology, not on the conclusions that are generated. *Kuhn v. Wyeth, Inc.,* 686 F.3d 618, 625 (8th Cir. 2012). To that end, expert testimony that is speculative, unsupported by sufficient facts, or contrary to the facts of the case, is inadmissible. *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006). A district court is not required to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. *General Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997). A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered. *Id.*

### 1. MR. WALWORTH'S QUALIFICATION AS AN EXPERT

First, the Court concludes that Mr. Walworth is qualified to provide an expert opinion on the issues in this case. Although, as the plaintiff points out, Mr. Walworth has no academic background "or training in the fields of animal science or animal behavior," that does not disqualify him from giving expert opinions on livestock behavior and feedlot operations. As demonstrated by his resume, Mr. Walworth has a plethora of practical experience in these areas. *See* filing 26-1. Given that he has worked with livestock for decades—and that for many of those years he owned and managed his own operations—the Court can conclude that Mr. Walworth has specialized knowledge in these areas that could be helpful to a trier of fact.

5

## 2. RELIABILITY OF MR. WALWORTH'S FIRST OPINION: ADEQUACY OF DEFENDANT'S FENCING

Just because a witness may have the practical experience and specialized knowledge necessary to formulate an expert opinion on a specific subject matter does not mean every opinion that witness offers on that subject matter is reliable and rests upon "good grounds." *See Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014). The reliability of an expert's particular opinion must be assessed separately. And here, where Mr. Walworth has failed to rely on industry-supported standards or methodologies in formulating his opinion on the reasonableness of the defendant's fencing structures, that opinion must be excluded.

In forming this opinion, Mr. Walworth focused on the fencing structures that the escaped heifer would have encountered on its "assumed" path. *See* filing 35-1 at 25, 27. On this path, to reach the highway, the heifer would have had to exit a trap pen by pushing through an electric wire fence before jumping over two permanent, four-wire backup fences. Filing 26-2 at 2. But according to Mr. Walworth's own testimony, he did not rely on any industry standards or methodologies to determine whether these three fences constituted a reasonable confinement practice for a feedlot in western Nebraska. *See* filing 35-1 at 29-30.

Instead, Mr. Walworth visually inspected the fences during his visit to the defendant's feedlot—which appeared in good repair—and used "logic": The fencing had to meet the acceptable industry standards because only one heifer had escaped the feedlot in 21 years. Filing 35-1 at 27, 30. This was the only standard or methodology Mr. Walworth used to formulate his opinion—he admittedly did not rely on any industry-accepted principles regarding acceptable fence heights, post spacing, or electrical wiring systems. Filing 35-

6

1 at 30. In fact, while Mr. Walworth acknowledged that the height of a fence and the spacing between its posts can be critical to successful confinement, he did not measure these aspects of the defendant's fences during his inspection. *See* filing 35-1 at 13, 29.

Mr. Walworth used a similar approach and logic when formulating his opinion about the reasonableness of the defendant's electric fencing equipment. During his inspection of the feedlot, Mr. Walworth did not test the electric fencing, either with a tester or his hands, to ensure there was an electrical current. *See* filing 35-1 at 22. Nor did Mr. Walworth collect enough information to determine how the electrical fence was powered. *See* filing 35-1 at 21. Instead, his methodology during the inspection was to see if the cattle were contained within the fence because "[if] the cattle were in there, it was working." Filing 35-1 at 22.

And Mr. Walworth reasoned that the electric fence must have also been functioning properly on the evening of the accident after he was told by Travis Williams, the feedlot manager, that on the morning after the accident twelve heifers were found outside of the trap pen and part of the electric fence had been "trampled." Filing 35-1 at 24. Because the majority of the cattle (over 100 head) did not cross the fence, Mr. Walworth opined that it must have been charged that evening and remained charged, even once it was knocked over, as livestock "aren't going to cross [a charged fence]." Filing 35-1 at 24. This also allegedly explained why the twelve heifers who were "pushed" over the fence did not reunite with the herd, despite that being their instinct. Filing 35-1 at 24.

But the Court simply cannot categorize opinions based on such rudimentary logic as expert opinion formulated using specialized knowledge and reliable industry methodologies, especially since Mr. Walworth's "logic" is

7

contradicted by his own admissions. Once, Mr. Walworth allegedly had 100 head of cattle run through a *charged* electric fence to chase a coyote. *See* filing 35-1 at 37. He also admits that livestock may pass through an electric fence after realizing it is not charged. *See* filing 35-1 at 22-23. Put simply, Mr. Walworth acknowledges there are situations where livestock may pass through both charged *and* uncharged electrical fences. And in this way, by basing his opinion on the fence's adequacy and reasonableness entirely on whether certain livestock crossed—without thorough consideration of the dimensions and formation of the fences as compared to accepted industry standards—there is too great of an analytical gap between the speculative facts assumed and the opinions he expressed.

Also problematic is that, in formulating this opinion, Mr. Walworth failed to meaningfully rule out alternative paths the escaped heifer may have taken in order to evaluate the adequacy of the fencing it would have encountered on such paths. Specifically, there is a road on the east side of the feedlot that is allegedly used by the feed trucks. Filing 35-1 at 26. This road ultimately leads to the highway where Mr. Preston's accident occurred, but the heifer's path to the highway from this road would have been blocked by non-electric, double gates that meet in the center and latch closed with a chain. Filing 35-1 at 26.

While Mr. Walworth acknowledged it was possible that the heifer *could* have ran down this road, *see* filing 35-1 at 28, he claimed it was "obvious" that it did not take this path because (1) Mr. Williams told him that the gate was closed with the chain on the evening of the accident, and (2) the gate appeared to be in good repair when he inspected it two years later. Filing 35-1 at 26-27. Based solely on statements from feedlot staff, Mr. Walworth focused exclusively on determining the reasonableness of the fences on the heifer's

8

"assumed" path and failed to independently assess the adequacy of the gate on the east road using accepted industry standards. *See* filing 35-1 at 25-36. Specifically, Mr. Walworth did not measure the fence and had no recollection of its height. Filing 35-1 at 29. And while he acknowledged that the distance between fence posts is important when assessing secureness, he also did not take these measurements during his inspection. Filing 35-1 at 29.

In sum, in Mr. Walworth's own words, his opinion that the defendant's fencing met acceptable industry standards is based on the fact that "[i]t's worked for them" pretty effectively for over twenty years. Filing 35-1 at 36. As Mr. Walworth has failed to rule out alternative theories and utilize standards generally accepted in the livestock industry, this opinion will be excluded.

3.    RELIABILITY OF MR. WALWORTH'S SECOND OPINION: WILDLIFE FIGHT

Next, the defendant argues that there is not an analytical gap in Mr. Walworth's opinion that the heifer escaped after being frightened by a raccoon fight. *See* filing 37 at 8. The Court disagrees. According to Mr. Walworth, he was faced with a specific question: "Why would a herd of cattle travel through a fence?" Filing 35-1 at 32. After considering the defendant's suggestion in its interrogatory answers that the heifer may have been spooked by wildlife, *see* filing 35-1 at 18, Mr. Walworth concluded that the escape was, in fact, caused by a raccoon fight given that (1) the feed bunk near the trap pen was a "[g]reat place for wildlife to hangout," and (2) in his experience wildlife fights are "pretty noisy." Filing 35-1 at 32-33; *see* filing 26-3.

And Mr. Walworth asserts that this theory was confirmed when he observed an abundance of raccoon and rabbit tracks at the defendant's feedlot two years after the accident. Filing 26-3. At this time, Mr. Williams also told him that there were "raccoons jumping out of the feed bunks almost every

morning." Filing 26-3. From these facts, Mr. Walworth opined that there was no other plausible reason the heifer escaped, as it was "pretty obvious" there was a raccoon fight that night. Filing 35-1 at 36.

However, Mr. Walworth admits that he has never observed a raccoon cause a cattle stampede (either because it was fighting with another raccoon or because it was chasing cattle). Filing 35-1 at 32-36. He is also unaware of any literature or industry materials asserting that such interactions may take place between livestock and raccoons. Filing 35-1 at 34. Further, there is no evidence in the record that raccoons have caused cattle to stampede in the twenty plus years these animals have allegedly been cohabitating on the defendant's feedlot. Still, in support of his conclusion, Mr. Walworth reasoned that the escaped heifer may have been more likely to scare if it hadn't been around raccoons in the past. Filing 35-1 at 36. But there was also no factual basis for such an assumption, as Mr. Walworth noted he was entirely unsure of where the heifer had come from and had "no idea if [it had] ever been around a raccoon." Filing 35-1 at 36.

In sum, while there may be facts supporting Mr. Walworth's opinion that there were raccoons near the escaped heifer on the night of the accident, the rest of his opinion—that a "raccoon fight" specifically caused the heifer's escape—is based on speculation and supported only by his own *ipse dixit*. There is no evidence in the record that there were raccoon tracks in the pen on the night of the accident. And according to Mr. Williams' testimony, he did not see raccoons in the trap pen on a daily basis. Filing 35-2 at 19-20. Based on these facts alone, there is an analytical gap between the existing facts and the opinion proffered. This gap is made even larger by Mr. Walworth's admission that he has no personal experience or industry materials to which he can point to support his opinion that raccoon fights may cause cattle stampedes similar

10

to the one that occurred in this case. In this way, Mr. Walworth's opinion about the raccoon fight was not formed using specialized knowledge and industry-backed methodologies, but instead, is based on speculation and his subjective beliefs. For this reason, his testimony on the cause of the heifer's escape will also be excluded.[1] Accordingly,

>IT IS ORDERED that the plaintiff's motion in limine to exclude Lynn Walworth's testimony (filing 32) is granted.

Dated this 9th day of September, 2022.

BY THE COURT:

John M. Gerrard
United States District Judge

---

[1] Even if the Court were to accept Mr. Walworth's conclusion that the heifer's escape was caused by an unavoidable raccoon fight, his opinion on the critical issue in this case—the defendant's liability—would still be inadmissible. Mr. Walworth admits that since interactions between wildlife and cattle happen "all the time," such entanglements are certainly foreseeable and livestock operations must learn to operate while dealing with wildlife. *See* filing 35-1 at 32, 38. In other words, according to Mr. Walworth, to act with reasonable care, livestock operations must have confinement equipment that can contain livestock when wildlife interactions inevitably occur. As stated above, however, Mr. Walworth failed to use industry-standards when assessing the defendant's fencing, and therefore, cannot offer a reliable expert opinion on the reasonableness of the defendant's fencing and its ability to adequately contain livestock in such instances.

11